## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MELISSA A. MONROE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09-CV-3338 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

BEFORE U.S. MAGISTRATE JUDGE BYRON CUDMORE:

### OPINION

Plaintiff Melissa A. Monroe appeals from the denial of her application for Social Security Disability Insurance Benefits and Supplemental Security Income (collectively "Disability Benefits") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416(I), 423, 1381a, and 1382c. This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c ). Monroe has filed a Motion for Summary Judgment (d/e 7), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 11). The parties consented, pursuant to 28 U.S.C. § 636(c), to have this matter proceed before this Court. Consent to Proceed Before a United States Magistrate Judge, and Order of Reference

entered June 8, 2010 (d/e 9).  For the reasons set forth below, the Decision of the Commissioner is affirmed.

<u>STATEMENT OF FACTS</u>

Monroe was born on June 15, 1977.  She completed the tenth grade. She last worked in 2005 at Culver's Restaurant in Springfield, Illinois, making sandwiches and serving as a cashier.  <u>Answer (d/e 4)</u>, attached <u>Certified Transcript of the Record of Proceedings before the Social Security Administration (R.)</u>, at 600-01.  She previously worked as a meat cutter, a retail stocking clerk, receptionist and a companion for disabled and elderly persons.  <u>R.</u> 133-40, 603.

Monroe suffers from depression and post traumatic stress disorder (PTSD).  <u>R.</u> 236.  In 1994, Monroe was hospitalized twice when she was sixteen years old for depression and suicidal thoughts.  <u>R.</u> 184-218.  At one point when she was sixteen, Monroe tried to kill herself by taking an overdose of Paxil.  <u>R.</u> 188.  Her mother reported at that time Monroe had been in a car accident when she was four years old.  According to her mother, Monroe had been in the hospital for a week after the accident, including three days in intensive care.  <u>R.</u> 204.

The medical records do not show any treatment for psychiatric or psychological problems until February 26, 2004.  On that date, Monroe was seen for assessment at the North Central Behavioral Health, Inc. (NCBH),

office in Ottawa, Illinois.  R. 236.  On March 24, 2004, Monroe saw Dr. Atul

Sheth, of NCBH, for an initial psychiatric medication evaluation.  Dr. Sheth

diagnosed Monroe with major depressive disorder, recurrent, mild to

moderate; dysthymic disorder; and PTSD by history.  He assessed her with

a Global Assessment of Functioning (GAF) of 55.  R. 248.  A GAF of 51-60

denotes moderate symptoms or moderate difficulty in social, occupational,

or school functioning.  Diagnostic & Statistical Manual of Mental Disorders,

32-34 (4th ed. Text Rev. 2000).

Monroe went to counseling sessions at NCBH in Ottawa, Illinois, from

March 2004, to May 2004, under the supervision of Dr. Sheth.  R. 230-35.

Her file was closed on August 7, 2004, because she did not respond to a

contact letter.  R. 401.

Monroe filed her application for Disability Benefits on August 17,

2004.  R. 93.  On October 9, 2004, Monroe completed a questionnaire

regarding her daily activities and her work history.  R. 128-40.  She stated:

> I'm really tired, depressed, don't feel like doing much cant [sic]
> sleep much at night don't eat write [sic] concerned about
> weight.  I'm pretty much a hermit.  I don't have a social life

R. 128.  She said that she had a poor memory and poor concentration.

She said that she was afraid at night and left the television and lights on

because of her fears.  R. 129.  She said that she drove her children to and

from school daily.  She said that she had no friends.  R. 130.  She said that

she did not like being in public.  <u>R.</u> 131.  She also said that she had

insomnia.  <u>R.</u> 130.  She also said that she had a neck injury from a car

accident when she was five years old.  <u>R.</u> 126.

On October 13, 2004, Monroe's mother Sandra J. Monroe completed

a Function Report–Adult Third Party form.  <u>R.</u> 141-48.  Monroe's mother

stated that Monroe had a pet frog.  Monroe's mother stated that she

babysat Monroe's children quite often on the weekends.  Monroe's mother

said that Monroe was more social before her depression.  She said that

Monroe had trouble sleeping.  <u>R.</u> 142. Monroe's mother said that Monroe

did her family's cooking, basic housecleaning and laundry.  She said that

Monroe got out of the house every day.  <u>R.</u> 143.  She said that Monroe

visited her mother's home often.  <u>R.</u> 144.  She said that Monroe's condition

affected Monroe's talking, completing tasks, and concentration.  <u>R.</u> 145.

She stated, however, that Monroe finished what she started.  She also

stated that Monroe was good at following written instructions. <u>R.</u> 145.

She classified Monroe's ability to get along with authority figures as, "ok."

<u>R.</u> 145.

Monroe returned to NCBH on October 13, 2004, for an assessment.

The comprehensive assessment report stated that she had symptoms of

PTSD and major depression, including trouble with remembering,

concentrating, or following simple instructions; phobias; racing thoughts;

and labile emotions.  R. 222-27.  The assessment report contained a recommendation for medication evaluation and therapy.  Monroe did not return to NCBH again in 2004.

On December 1, 2004, Monroe was evaluated by psychologist Dr. Joel Eckert, Psy.D.  R. 253-260.  Monroe reported that she had been in a car accident when she was about four or five years old.  She said that she was in a coma for two weeks and was told that she had suffered brain damage as a result.  She said that she achieved only a fourth-grade reading level in school.  She reported that she was sexually molested during her childhood by the son of a babysitter and an elderly neighbor. R. 255.  She reported being hospitalized for mental problems twice when she was fourteen years old.  She stated that she tried to kill herself when she was fourteen.  R. 256.  She reported that she had two sons, ages five and four, and a daughter, age two.  R. 257.  Dr. Eckert diagnosed Monroe with major depression, recurrent, moderate to severe with anxious features; and dysthymic disorder. R. 260.

On January 21, 2005, agency psychologist Carl Hermsmeyer, Ph.D., conducted a review of Monroe's medical record and completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment form.  R. 261-78.  Dr. Hermsmeyer opined that Monroe had mild restrictions of activities of daily living, moderate difficulties

maintaining social functioning, and moderate difficulties maintaining

concentration, persistence, or pace. He also opined that she experienced

no episodes of decompensation. R. 271. He further opined that she had

moderate limitations on her ability to understand and remember detailed

instructions and moderate limitations on her ability to carry out detailed

instructions. R. 275. Dr. Hermsmeyer opined,

> The claimant has a diagnosis of major depression, recurrent,
> moderate to severe, and dysthymic disorder. The severity does
> not meet or equal any mental listings, but is more than non-
> severe. Although the claimant may have problems with
> understanding, remembering and the ability to carry out
> detailed instructions, the claimant retains the mental capacity to
> perform simple one and two-step tasks at a consistent pace.

R. 277. On May 27, 2005, agency psychologist Leslie Fyans, Ph.D.,

concurred with Dr. Hermsmeyer's assessment of Monroe. R. 281.

On August 10, 2005, Monroe saw Dr. Sheth at NCBH again for a

psychiatric evaluation. R. 439-42. Monroe reported having difficulty

sleeping, and low energy. She said that she became nervous at night and

would stay home at night. She felt as if someone was after her. She would

leave the television on at night. During the day, she felt that others were

talking about her or thinking about her. She said that she felt nervous

around people. She reported having mood swings. R. 439. Dr. Sheth

prescribed Seroquel and Zoloft. R. 441. Dr. Sheth diagnosed Monroe with

major depressive disorder, recurrent, and PTSD. He assigned a GAF

score of 58.  R. 446-47.  Dr. Sheth stated that Monroe had issues with depression and lack of motivation, and that she was struggling with issues of past abuses which are coming out as paranoia.  R. 446.  Monroe previously reported to NCBH personnel that she suffered physical emotional, verbal, and sexual abuse in the past, and that she had been raped.  R. 415.  On August 17, 2005, Monroe called Dr. Sheth's office to report that she stopped taking the Seroquel and Zoloft because the medication upset her stomach and caused her to have difficulty getting out of bed.  R. 452.  He also started her on regular therapy sessions with NCBH therapists.

On August 30, 2005, NCBH personnel conducted a bio-psychosocial assessment of Monroe.  R. 377-79.  Monroe reported being depressed and having low energy.  She again reported that she became nervous at night and would stay home at night; that she felt as if someone was after her; that she would leave the television on at night; that during the day, she felt that others were talking about her or thinking about her; that she felt nervous around people; and that she had mood swings.  R. 377.  Monroe reported having little energy or motivation.  She reported being fearful of people in general, paranoid at night, having insomnia, feeling edgy all the time, and feeling detached from her sons.  R. 377.  At the time of the

assessment, she had three children, a son aged six, a son aged five, and a daughter aged three.  She was unmarried.  R. 378.

On August 31, 2005, Monroe attended a therapy session at NCBH. Monroe exhibited symptoms of depression, low self esteem and absence of hope.  R. 454.  On September 14, 2005, Monroe was prescribed Wellbrutin and Ativan.  R. 455.  On September 30, 2005, Monroe attended another therapy session at NCBH.  The therapist noted that Monroe was "markedly improved but had some ways to go."  R. 456.  On October 21, 2005, Monroe reported to the therapist that the medication was helping "to take the edge off," but she still had days when she felt that she could not "make it."  R. 456.  The therapist noted that Monroe needed assistance "to reach her goal of stability and functioning."  R. 456.

On October 31, 2005, Monroe's primary care physician Dr. Kurt R. Crowe, referred Monroe to a neurosurgeon, Dr. William Olivero, due to Monroe's continuing neck pain.  Dr. Crowe stated in his referral letter to Dr. Olivero, in part:

> Other than pain in the neck and back she has been relatively asymptomatic.  She had no paresthesias or weaknesses.  She is normally active and really has no other significant medical problems with the exception of reflux for which she takes Prevacid.

R. 360.  In January 2006, Dr. Olivero recommended against surgical intervention.  He recommended physical therapy.  R. 351.

On January 4, 2006, Monroe reported to her therapist at NCBH that she still felt depressed once in a while. Monroe stated that she was having a hard time getting over the loss of a child. Monroe stated that eight years earlier she had a daughter that was still born. R. 458. In January 2006, Monroe visited the cemetery where the child was buried. On January 25, 2006, Monroe reported to her therapist that her medication was helping and that she was able to face the death of her child. The therapist noted that Monroe "seems less 'depressed' and is able to face life with more stable emotions." R. 458. The therapist, however, noted that she faced challenges. She was a single mother of three, and she had some chronic pain in her back and neck caused by injuries in a car accident several years earlier. R. 458-59.

Monroe continued regular sessions with her therapist. At the March 15, 2006, session, Monroe reported an increase in her symptoms. The therapist suggested some relaxation techniques. R. 481. On March 24, 2006, Monroe's therapist noted that Monroe's symptoms were not as intense and she was able to smile a few times. R. 487. In May and June 2006, Monroe participated in groups skills training sessions at NCBH. R. 488.

On July 7, 2006, NCBH issued another comprehensive assessment report on Monroe. The July 7, 2006, report seems to be a copy of the

October 13, 2005, report.  Both reports listed Monroe's age as 26 years.

R. 222 and 386.  Both reports contained the same typographical errors.

Compare R. 222-28 with 386-92 (father spelled "Fatehr" in both reports

(R. 222 and 386); to spelled "t" in both reports, Catholic spelled "CAtholic"

in both reports, and alone spelled "alne" in both reports (R. 224 and 388)).

Both reports listed her GAF score as 52.  R. 228 and 392.[1]

    Monroe continued to have regular therapy sessions in August and

September 2006.  On August 4, 2006, Monroe's affect was teary, she

reported that she was not sleeping, and that her memory was sketchy.

R. 512.  On August 18, 2006, Monroe exhibited slowed speech, thought

process and content.  R. 512.  On September 1, 2006, Monroe's mood was

positive, and she was less depressed, but her thought process was

circular.  R. 512.

    On January 10, 2007, Dr. Sheth completed a Psychiatric/

Psychological Impairment Questionnaire (Questionnaire).  R. 369-76.

Dr. Sheth listed Monroe's diagnosis and major depressive disorder,

recurrent and PTSD.  He opined that she was "unemployable due to her

inability to cope with the symptoms associated with her depression and

---

[1]The Court also notes that both reports also stated that Monroe was "thin."  R. 222 and 386.  Monroe testified in the evidentiary hearing that she was five foot two inches and weighed 180 pounds. R. 598.  The Administrative Law Judge (ALJ) found that Monroe was impaired due to, in part, obesity.  R. 25.

Post Traumatic Stress D/O." R. 369.  He assigned a GAF score of 55, and

opined that her highest GAF since he started treating her in 2004 was 58.

R. 369.

The Questionnaire asked Dr. Sheth to "Identify the positive clinical

findings that demonstrate and/or support your diagnosis." R. 370.  The

Questionnaire listed several options.  In response, Dr. Sheth selected poor

memory, appetite disturbance with weight change, sleep disturbance,

emotional lability, recurrent panic attacks, anhedonia or pervasive loss of

interests, paranoia and inappropriate suspiciousness, feelings of

guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or

isolation, blunt, flat or inappropriate affect, decreased energy, intrusive

recollections of a traumatic experience, persistent irrational fears,

generalized persistent anxiety, and pathological dependence or passivity.

R. 370.

Dr. Sheth further opined on the Questionnaire that Monroe had

marked limitations in understanding and memory; moderate to marked

limitations on concentration and persistence; moderate to marked

limitations on social interactions; and moderate to marked limitations on

adaptation.  R. 373-74.  Dr. Sheth further opined that experienced episodes

of deterioration or decompensation in work and work-like settings which

caused her to withdraw from the situation or to experience an exacerbation

of her symptoms.  Dr. Sheth opined that Monroe could not understand or remember simple instructions and had a lack of concentration.  R. 374.  He further opined that these symptoms would last at least twelve months and that Monroe was not a malingerer.  R. 375.  He further opined that she would be absent from work two to three times a month.  R. 376.

Monroe continued individual and group therapy sessions at NCBH in 2007.  On February 27, 2008, Dr. Sheth wrote a letter to the Social Security Administration.  He stated that he had treated Monroe since August 10, 2005, for major depressive disorder and PTSD.  R. 575.  He opined that:

> Ms. Monroe is unemployable due to her inability to cope with the symptoms associated with her depression.  I believe that she has been disabled since before I met her in 2005 and I expect her to remain disabled indefinitely.

R. 575.

The ALJ held a hearing on March 11, 2008.  Monroe appeared in person and with her attorney.  Vocational expert Dennis Gustafson also appeared.  R. 597.  Monroe testified first.  Monroe testified that she was unmarried.  She lived in a house with her three children and a roommate. The children were ages nine, seven, and five.  R. 598.  Monroe finished the tenth grade.  R. 600.

Monroe testified that she was very paranoid.  She said that she thinks that other people are talking about her.  She also said that she was slow to

understand things.  R. 604.  She also stated that she was, "a really

depressed person, anxiety.  I got Post-Traumatic Stress Disorder from my

past, when I was growing up and when I was married."  R. 605.  She said

that she sometimes got panic attacks when she was around too many

people.  R. 614.  Monroe testified that she stopped working:

> Because it's getting worse as I get older and I tried working for
> a long time as much as I can and I got older and I wasn't going
> to counseling for a long time when I was younger, because I
> was on the streets and now I'm just trying to deal with it.

R. 614.

Monroe testified that she was fired from most of the jobs she ever

had.  She said she was fired because, "I was too slow.  I wasn't doing

things right.  I wasn't friendly with the customers."  R. 614.

She testified that she had trouble sleeping.  She testified that she

went to a doctor for a sleep study and was told she had restless leg

syndrome.  R. 612-13.  She said that she slept about five to six hours a

night.  She said that she did not sleep during the day.  R. 613.  She also

said that she had neck pain, shoulder pain, and migraine headaches as a

result of injuries she suffered in an accident long ago. R. 604.

Monroe testified that she took medications for her mental problems.

She also saw a psychological counselor on a weekly basis.  Sometimes

she saw the counselor for individual sessions, and sometimes she saw the

counselor in a group session.  R. 605.  She testified that her medications, "helps me more think better, but once it starts leaving my body I feel it like, like I'm getting over-depressed and I'm always sluggish and I don't have much energy for anything."  R. 604.

Monroe testified about her daily activities.  She usually got up at 6:00 a.m. and got her children ready for school.  At 7:00 a.m., she usually dropped them off at school and then returned home and watched TV.  She prepared after-school snacks and dinner for her children.  She also did laundry every now and then.  R. 606.  She washed dishes and went to the grocery every now and then.  She did a little bit of sweeping, but no vacuuming.  R. 607.  She did not belong to groups or clubs.  She did not visit with friends and family.  R. 607.  She drove, but not too much.  She drove her children to school every day.  She did not do yard work.  R. 608.

She collected coins as a hobby.  R. 608.  She also had a pet rabbit.  R. 611.  She took her kids to the park every now and then.  R. 609.  She went to the public library to use the computer.  R. 610.  She last went out-of-state a year earlier.  She went to Indiana to drop her roommate off at a location for work.  R. 610.  She also attended a couple of plays at her children's school.  R. 611.  She also drove her children to church once a week.  R. 612.

Monroe bathed herself and took care of her personal hygiene. She quit smoking two years earlier because her children complained about her smoking. R. 609.

Vocational expert Gustafson then testified. The ALJ asked Gustafson:

> Mr. Gustafson, I would like you to assume as individual who is between 27 and 30 years old, has a tenth grade education, past relevant work as you have outlined, an individual who is limited to light and sedentary work that is routine and repetitive without constant interaction with others. How would these restrictions affect the performance of the past relevant work?

R. 615. Gustafson opined that the individual could not perform Monroe's past relevant work. Gustafson, however, opined that such an individual would be able to perform several different types of jobs:

> Some examples in the areas of cleaning work, first of all, building cleaning jobs that are light. These are state of Illinois figures, approximate, 7,919; and then in the area of maids and housekeeping cleaners, the light jobs would essentially be hotel room cleaners, that figure is 13,963; landscaping, grounds keeping related jobs, light 3,566. There's some other jobs in, looking at manufacturing-related jobs, packaging and filling machine operators, light, 12,174, sedentary 358; production inspection sorting and sampling, light, 4,543, sedentary, 471; jobs classified as production worker helpers and production workers or production worker helpers, light, 10,767, sedentary 823.

R. 615-16. On cross-examination, Gustafson opined that the individual would lose employment if the individual did not meet production criteria for a job. R. 617.

The ALJ issued her decision on April 24, 2008.  R. 23-33.  The ALJ
followed the five step Analysis set forth in the Social Security
Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.
Step 1 requires that the claimant not be currently engaged in gainful
activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the
claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c),
416.920(c).  If true, Step 3 requires a determination of whether the claimant
is so severely impaired that she is disabled regardless of the claimant's
age, education and work experience.  20 C.F.R. §§ 404.1520(d),
416.920(d).  The listings of such severe impairments are set forth in 20
C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  The claimant's condition
must meet the criteria in a Listing or be equal to the criteria in a Listing.  20
C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the
claimant not to be able to return to her prior work considering her Residual
Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the
claimant cannot return to her prior work, then Step 5 requires a
determination of whether the claimant is disabled considering her RFC,
age, education, and past work experience.  20 C.F.R. §§ 404.1520(f),
416.920(f).  The claimant has the burden of presenting evidence and

proving the issues on the first four steps.  The Commissioner has the burden on the last step: The Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995); Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995).

The ALJ found that Monroe met her burden at Steps 1 and 2 of the Analysis.  She was not engaged in substantial gainful activity and she had severe impairments including depression, anxiety, obesity and history of an old cervical spine fracture that resulted in neck and back pain.  R. 25.

The ALJ found at Step 3 that Monroe's impairments did not meet any Listing.  The ALJ considered the Listings for affective disorders and anxiety related disorders.  Listing 12.04; Listing 12.06.  Either Listing requires that the person's mental condition has resulted in two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration.  Listing 12.04 (B); Listing 12.06 (B).[2]  Repeated episodes of extended duration means at least three

---

[2]In the alternative, the claimant could meet the requirements of § C of each of the two Listings.  Listing 12.04 (C); Listing 12.06 (C).  Monroe makes no claim that she would meet the requirements of § C of either Listing.

episodes in a year with each lasting at least two weeks.  Listing 12.00 (C)(4).

The ALJ found that Monroe had only mild restrictions on activities of daily living and only moderate difficulties in the social functioning and maintaining concentration, persistence or pace.  R. 28-29.  The ALJ relied on Monroe's daily activities, including her child care activities, household activities, her hobby of coin collecting, her care of a pet rabbit, and her regular visits to counselors.  R. 29.  The ALJ also relied on the opinions of agency psychologists Drs. Hermsmeyer and Fyans.  R. 31.  The ALJ also cited the consistent GAF scores in the 50s as indicating only moderate restrictions.  R. 29.  The ALJ found no evidence of decompensation necessary to meet a Listing.  R. 29.

At Step 4, the ALJ found that Monroe had the RFC to perform light and sedentary work due to pain and obesity, with further limitations due to her mental impairments to routine and repetitive work without constant interaction with others.  R. 29.

The ALJ found that Monroe's testimony about the severity of her symptoms was not credible.  The ALJ stated that Monroe exaggerated events and reported events inconsistently.  The ALJ noted that she reported to medical personnel that she was hospitalized when she was nine and fourteen for her mental condition, but the records showed that she

was hospitalized when she was sixteen.  She noted that Monroe claimed that she was in an automobile accident as a young child that left her in a coma for two weeks and caused brain damage.  Her mother, however, reported that she was hospitalized for one week and did not mention a coma.  R. 30.

The ALJ found that Dr. Sheth's opinions should not be given controlling weight.  The ALJ stated that Dr. Sheth's opinions were inconsistent and unsupported by the evidence in the record as a whole, including his own progress notes and therapy notes.  R. 30.  The ALJ cited the gap in treatment between October 2004 and August 2005.  The ALJ noted the GAF scores that consistently were in the 50s, indicating moderate limitations.  The ALJ also stated that Dr. Sheth's findings were inconsistent with Dr. Crowe's observations that Monroe was generally healthy and active.  R. 31.  Last, the ALJ relied on the opinions of Drs. Hermsmeyer and Fyans that Monroe's limitations were only moderate, not marked.  R. 31.

The ALJ then determined at Step 4 that Monroe could not return to her past work based on Gustafson's opinion.  At Step 5, the ALJ determined that Monroe could perform a substantial number of jobs available in the national economy based on the Medical-Vocational

Guidelines and the opinions of vocational expert Gustafson.  R. 31-32.
The ALJ, therefore, concluded that Monroe was not disabled.

Monroe appealed the Decision to the Appeals Council.  The Appeals
Council denied her request for review on October 30, 2009.  She then filed
this action for judicial review.

ANALYSIS

This Court reviews the ALJ's Decision to determine whether it is
supported by substantial evidence.  In making this review, the Court
considers the evidence that was before the ALJ.  Wolfe v. Shalala,
997 F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such
relevant evidence as a reasonable mind might accept as adequate" to
support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).
This Court must accept the ALJ's findings if they are supported by
substantial evidence, and may not substitute its judgment for that of the
ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ further
must articulate at least minimally her analysis of all relevant evidence.
Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be
able to "track" the analysis to determine whether the ALJ considered all the
important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

The ALJ's Decision is supported by substantial evidence.  The ALJ's
finding that Monroe did not meet a Listing and her finding regarding

Monroe's RFC are both supported by the opinions of Drs. Hermsmeyer and Fyans, the observations of Dr. Crowe, and the evidence of Monroe's daily activities. The finding at Step 5 that Monroe could perform a substantial number of jobs in the national economy is supported by the testimony of vocational expert Gustafson.

Monroe argues that the ALJ erred in failing to give Dr. Sheth's opinions controlling weight. A treating physician's medical opinion is entitled to controlling weight when it is well supported by medically acceptable clinical and diagnostic techniques and is reasonably consistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. The ALJ found that Dr. Sheth's opinions were inconsistent with the other evidence in the record. Dr. Sheth's opinion that Monroe had marked or moderate restrictions on daily living activities, social functioning, and concentration was inconsistent with the opinions of Drs. Hermsmeyer and Fyans that her restrictions were only mild to moderate.[3] The NCBH therapy progress notes from September 30, 2005, through January 6, 2006, also indicated that Monroe was improving

_____

[3]Dr. Sheth also opined that Monroe experienced episodes of deterioration or decompensation in work and work-like settings which caused her to withdraw from the situation or to experience an exacerbation of her symptoms. R. 374. Dr. Sheth did not opine that Monroe experienced repeated episodes of decompensation, each of extended duration. Thus, Dr. Sheth did not opine that Monroe met the decompensation factor in Listing 12.04. No other evidence in the record indicated that Monroe experienced extended episodes of decompensation.

and responding well to her medications.  R. 456-59.  Monroe also was fairly active.  She left home daily to take her children to and from school.  Her mother stated that Monroe came to the mother's home often.  Her mother stated that she often babysat on the weekends.  Dr. Crowe, her primary care physician, described her as normally active with few medical problems.  All this evidence supports the ALJ's conclusion that Dr. Sheth's opinions were inconsistent with evidence in the record.  Substantial evidence, therefore, exists in the record to support the ALJ's finding that Dr. Sheth's opinions were not entitled to controlling weight in this case.

Monroe argues that the ALJ erred by failing to articulate the weight that she assigned to Dr. Sheth's opinions.  The Court disagrees.  The ALJ must minimally articulate her analysis of all the relevant evidence.  The ALJ has done so here.  She agreed with Dr. Sheth that Monroe suffers from depression and PTSD, but she concluded that the illness moderately impairs Monroe rather than markedly impairs her.  The ALJ minimally articulated her analysis of all the relevant evidence, including Dr. Sheth's opinions.

Monroe argues the ALJ erred in her findings at Step 3 because Monroe met Listing 12.04 for affective disorder.  The Court disagrees.  In Monroe's case, Listing 12.04 required that she must have exhibited two of the following: marked restriction of activities of daily living; marked

difficulties in maintaining social functioning; marked difficulties in maintaining concentration persistence, or pace; or repeated episodes of decompensation, each of extended duration. The ALJ found that Monroe suffered moderate restrictions social functioning, and in maintaining concentration, persistence or pace. The ALJ also found no episodes of decompensation. As explained above, substantial evidence exists in the record to support these findings.

Monroe argues that the ALJ relied on GAF scores alone to make these determinations. The Court disagrees. The ALJ cited Monroe's GAF scores as one factor. Those scores were consistently in the 52 to 58 range, which indicate moderate limitations. The ALJ, however, also relied on Monroe's level of daily activity, the opinions of Drs. Hermsmeyer and Fyans, and the observations of Dr. Crowe. The ALJ did not improperly rely on GAF scores alone.

Monroe complains that the ALJ did not discuss Dr. Sheth's opinions as part of her analysis at Step 3. Monroe relies on Fuller v. Astrue, 2010 WL 272877 (C.D.Ill. 2010), to support this proposition. In Fuller, the ALJ made factually erroneous statements about the claimant's daily activities and failed to discuss significant parts of Fuller's medical treatment history anywhere in the opinion, including the failure to discuss evidence of five hospitalizations for attempted suicide from November 2003 through April

2006. <u>Fuller</u>, 2010 WL 272877, at *10-11. By failing to discuss this evidence, the ALJ in <u>Fuller</u>, "failed to build a logical bridge between the evidence and her conclusion." <u>Id.</u>, at *11. In this case, the ALJ articulated her analysis of the relevant evidence and explained the basis for her conclusions, including her conclusions at Step 3.

Monroe challenges the ALJ's credibility determinations. The Court will not review the credibility determinations unless the determinations lack any explanation or support in the record. <u>Elder v. Astrue</u>, 529 F.3d 408, 413-14 (7th Cir. 2008). The record provides support for the ALJ's determination that Monroe was not credible. For example, Monroe made claims about her past that were contradicted by her mother. Monroe reported to healthcare professionals that she was in a coma and suffered brain damage as a result of the car accident when she was five years old, but her mother reported that she was hospitalized for one week and did not mention brain damage. <u>R.</u> 204. Her mother also contradicted some of Monroe's testimony about her daily activities. Monroe said that she did not go out socially to visit friends and family, but her mother said that Monroe often came to her mother's home to visit, and she often babysat for Monroe on the weekends. <u>R.</u> 144-48. This evidence provides some support in the record for the ALJ's credibility determination. The Court, therefore, will not reverse the ALJ's credibility findings.

THEREFORE, the Defendant Commissioner's Motion for Summary Affirmance (d/e 11) is ALLOWED, and Plaintiff Melissa A. Monroe's Motion for Summary Judgment (d/e 7) is DENIED.  The Decision of the Commissioner is affirmed.  All pending motions are denied as moot.

THIS CASE IS CLOSED.

ENTER:   January 12, 2011


_____ *s/ Byron G. Cudmore* _____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE